AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

10/30/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

300 Calumet Lane, Dayton OH 45417

)
)
)
)
)
)

Case No.     3:23-mj-470

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHEMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841 & 846 | Distribution of a controlled substance and conspiracy to commit the same |
| 21 U.S.C. Section 843 | Use of a Communication Facility to commit a felony drug offense |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Sean C. Humphrey*
*Applicant's signature*

Sean C. Humphrey, USPIS Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date:   10/30/23

City and state:  Dayton, OH

Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

*Property to be searched*

The property and curtilage to be searched, pictured below, is 300 Calumet Lane, Dayton, OH 45417, further described as a single-story residence with red brick and light tan or off-white siding. The number "300" is in black to right of the window.



## ATTACHMENT B

*Property to be seized*

1.  All records relating to violations of 21 U.S.C. §§ 846, 843, and 841(a)(1), those violations involving unknown suspects and occurring after May 25, 2023, including:

    a.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, telephone numbers and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances, including information reflecting transactions for the purchase/sale of narcotics.

    b.  Papers, tickets, notices, credit card receipts, wire transfer receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail, calendars and other correspondence.

    c.  Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

    d.  Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

    e.  Electronic equipment such as pagers, computers, Computer systems, cell phones, PDA devices including hardware, software, data contained in the main unit, printers, external modems, monitors, fax machines and/or other external attachments, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

        i.  This warrant only grants legal authority for law enforcement to *seize* the above-described electronic equipment likely to contain evidence of violations of 21 U.S.C. §§ 846, 843, and 841(a)(1), and to secure said items. A separate warrant will be sought to conduct a *search* of any above-described electronic equipment.

f. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

g. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

h. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

i. Contraband, such as controlled substances and other materials, paraphernalia and/or equipment and tools used in the drug trade.

j. Firearms or ammunition.

## ATTACHMENT C

Upon delivery of the SUBJECT PACKAGE (as described in the Affidavit submitted with the warrant application) and the SUBJECT PACKAGE being taken into the residence at the PREMISES, the search warrant will be executed at the PREMISES. The search warrant will be executed at the PREMISES if, and only if, the SUBJECT PACKAGE is taken into the residence located at the PREMISES.

Furthermore, if the SUBJECT PACKAGE is transferred to any vehicle or other property located within this Court's jurisdiction, this warrant authorizes law enforcement to secure the location until an application for a new warrant can be obtained.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 300 CALUMET LANE, DAYTON, OH 45417 | 3:23-mj-470<br><br>Case No._____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR AN ANTICIPATORY WARRANT TO SEARCH AND SEIZE

I, Sean C. Humphrey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for an anticipatory warrant to search the premises known as 300 Calumet Lane, Dayton OH 45417, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B. Based on my training and experience, I submit that, if the relevant condition in Attachment C is satisfied, there will be probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime - namely, drug trafficking and conspiracy to commit drug trafficking, in violation of Title 21 U.S.C. §§ 841 and 846; and use of a communication facility to commit a felony, in violation of Title 21 U.S.C. § 843 - exists and will be found at the PREMISES.

2.      I am employed by the Dayton Police Department and have been so since July of 2008. I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau -

1

Montgomery County Regional Agencies Narcotics and Gun Enforcement (RANGE) Task Force. I have extensive prior experience in investigating drug cases that resulted in successful prosecution of persons involved in trafficking of drugs, possession of drugs and other related offenses. I have been involved in narcotics related arrests, executed search warrants that resulted in the seizure of narcotics and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities, as well as the locations at which they reside and where they store controlled substances and the illegal proceeds derived therefrom. Through training and experience, I am familiar with the practices of narcotics distributors and sellers, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering.

3. I have been a Task Force Officer with the United States Postal Inspection Service since November 2022. I am presently assigned to the Cincinnati Field Office of the United States Postal Inspection Service, Pittsburgh Division, with investigative responsibility for Southern District of Ohio. Part of my responsibility involves investigating the illicit use of the United States Mails in the transportation of narcotics, other dangerous controlled substances, and financial proceeds from, or instrumentalities used in, the sale of such narcotics and controlled substances (hereinafter, "Drugs and/or Proceeds").

4. Based on my training and experience, I have become aware that drug traffickers frequently use Priority Mail Express, a business-oriented overnight service offered by the United States Postal Service, to transport narcotics and other dangerous controlled substances, and their proceeds or instrumentalities from the sale of the controlled substances. Based on my training

2

and experience, I also know that drug traffickers frequently use Priority Mail with delivery confirmation, a two-three day service offered by the United States Postal Service. As a result of investigations and successful controlled substance prosecutions where the U.S. Mail was used, I have learned of certain characteristics indicative of other U.S. Mail items previously identified as containing narcotics or other dangerous controlled substances, their proceeds or instrumentalities from the sale of the controlled substances. Some of these characteristics include, but are not necessarily limited to or used on every occasion, the mailer using different post offices on the same day to send parcels, false or non-existent return address, the addressee is not known to receive mail at the listed delivery address, the parcel is heavily taped, the parcel is mailed from a known drug source location, labeling information contains misspellings, the label contains an illegible waiver signature, unusual odors emanating from the parcel, and the listed address is located in an area of known or suspected drug activity.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

**A. USPIS intercepted a package containing approximately four ounces of a white pressed powder material that field-tested positive for Cocaine, a Schedule II controlled substance.   The package additionally contained approximately three ounces of blue pills with M30 pressed on the pills and one pound, nine ounces of multicolored tablets, both believed to contain fentanyl.**

6.     On October 27, 2023, the U.S. Postal Inspection Service intercepted the SUBJECT PACKAGE at the Cincinnati Network Distribution Center in Cincinnati, OH. The SUBJECT PACKAGE is a brown box bearing USPS Priority Mail tracking number 9505 5100 5288 3298 8004 59 mailed from Post Office 89106, located in the Las Vegas, Nevada, postmarked October 25, 2023. I know, based on my training and experience, that Las Vegas, Nevada is a

3

known source location for narcotics. The recipient's information listed on the SUBJECT PACKAGE is "Chris Jerkins, 300 Calumet Lane, Dayton, Ohio 45417." The sender's information listed on the SUBJECT PACKAGE is "Greg Jerkins, 463 Duchess Ave, Las Vegas, NV 89030."

7.     I was able to perform a check in CLEAR for the recipient's information listed on the Package of "Chris Jerkins, 300 Calumet Lane, Dayton, Ohio 45417." CLEAR is a law enforcement database that is used as a tool for investigators to identify person/business and address information. According to CLEAR, there is no "Chris Jerkins" associated with 300 Calumet Lane, Dayton, OH 45417.

8.     I was able to perform a check in CLEAR for the sender's information listed on the Package of "Greg Jerkins, 463 Duchess Ave, Las Vegas, NV 89030." According to CLEAR, there is no "Greg Jerkins" associated with 463 Duchess Ave., Las Vegas, NV 89030.

9.     Based on my training and experience, I know that Las Vegas is a known source of supply for drugs.  In my personal experience I have been involved in previous investigations of narcotics shipped through the United States Mail sent from Las Vegas, NV, to the Southern District of Ohio.

10.    A certified drug detection canine officer performed an open-air sniff on the SUBJECT PACKAGE and alerted to the presence of an odor of controlled substances emanating from the SUBJECT PACKAGE.

11.    As a result of my investigation, on October 27, 2023, I obtained and executed a federal search warrant (3:23mj458) on the SUBJECT PACKAGE. Upon opening the SUBJECT PACKAGE, I discovered that it contained a Ninja Blender box, that was wrapped in plastic wrap. The Ninja Blender box did not contain the blender; however, a large plastic wrapped bundle was inside

4

it. The bundle contained multiple layers of plastic wrap and vacuum sealed bags. The bundle contained four separate bags inside it. A bag weighing approximately four ounces or 113 grams, contained a white pressed powder. Another bag contained approximately three ounces or 85 grams of blue pills with M30 pressed on them. The last two bags contained a combined weight of one pound nine ounces or 708 grams of multicolored tablets.

12. The white powder was field-tested using a TRUNARC narcotics analyzer. The TRUNARC narcotics analyzer alerted positively to the presence of cocaine, a Schedule II controlled substance. Based on my training and experience, the pressed white powder is consistent in appearance with cocaine. I will send the substance to a laboratory for forensic testing to confirm my belief that the pressed white powder is in fact cocaine. The blue pills with M30 and the multicolored tablets are suspected to be pressed fentanyl. They will also be sent to laboratory for forensic testing to confirm the belief that they contain fentanyl.

13. Based on my training and experience, I know that the current street value of this amount of narcotics can range from approximately a minimum of $10,000 up to $20,000, depending on purity, whether a purchaser is buying in bulk, and how good of a relationship or connection the purchaser has to the seller.

14. Based on my training and experience, I know that, while drug traffickers often place fictitious names on drug parcels such as the SUBJECT PACKAGE to conceal their identity from law enforcement, I also know that they are reticent to send such a high-value item to a random address. The cocaine and fentanyl recovered from the SUBJECT PACKAGE has a street value in the thousands of dollars, as detailed above. Given the value of the contraband within the parcel, a drug trafficker likely will send a package only to a location that either they control or that is occupied or controlled by a drug associate or customer.

15. Based on my training and experience, and given the value of the narcotics recovered in the SUBJECT PACKAGE, I know that it is extremely unlikely a drug trafficker would send such a high-value quantity of narcotics to a person or residence that was not controlled by them or a known associate. It is therefore extremely unlikely that a drug trafficker would risk such a high-value quantity of narcotics to a random or uninvolved person or residence as part of a set up or based on a whim.

16. Based on my training and experience, I know that the locations to which drug packages are sent will contain evidence of earlier drug shipments such as mailing labels, discarded parcels, and packaging materials containing drug residue. Additionally, I know that drug traffickers often use the homes to which they send drug parcels to process and store controlled substances until they can find a buyer for their product. Additionally, the delivery location often contains information revealing the identity of the package's true recipient. Moreover, I have learned that the recipient at the delivery location also frequently communicates with individuals who either shipped the drug parcel or are the final intended customer of this illegal product. Using cellular telephones or email, the recipient at the delivery location will communicate with confederates – such as sending messages concerning the status of the delivery as well as pictures of previous parcels. Thus, performing a controlled delivery of the parcel to the delivery location is highly likely to lead to the discovery of evidence or contraband relating to drug trafficking crimes.

17. The SUBJECT PACKAGE was on course to be delivered to the PREMISES, and would have arrived at the PREMISES by now if not for law enforcement intervention.

18. Based on my training and experience, and all of the information contained in this Affidavit, if the SUBJECT PACKAGE is accepted and taken into the PREMISES, evidence of violations

6

of 21 U.S.C. §§ 846, 843, and 841(a)(1), including additional contraband, are likely to be discovered at the PREMISES.

**B. A USPS agent will attempt to deliver the SUBJECT PACKAGE to the PREMISES; if someone at the PREMISES accepts delivery of the SUBJECT PACKAGE, USPS agents will execute a search of the PREMISES.**

19. Agents involved in this investigation are separately seeking a search warrant to place a GPS tracking device and a light detection device inside the SUBJECT PACKAGE. Agents will replace the suspected narcotics with "sham" drugs[1] and attempt delivery of the SUBJECT PACKAGE containing the sham drugs and tracking device at the PREMISES and then serve this search warrant. A United States Postal Inspector posing as a United States Letter Carrier will attempt to make contact with an occupant at the PREMISES. If and when a person at the PREMISES answers the door, the agent will ask the person to acknowledge receipt of the SUBJECT PACKAGE.

20. If no one is home when agents attempt to deliver the SUBJECT PACKAGE, agents will try again until the final date for which the Court authorizes execution of this search warrant. During all delivery attempts, law enforcement officers involved will maintain surveillance on the SUBJECT PACKAGE.

21. **CONDITION PRECEDENT**: This search warrant will only be served after the SUBJECT PACKAGE has been delivered to and received by someone at the PREMISES and taken into the PREMISES. At that time, and not before, I and other law enforcement personnel will execute this search warrant. In no event will the search warrant be executed if the SUBJECT PACKAGE is not taken into the PREMISES.

---

[1] The sham drugs will be made from a substance that is not illegal or dangerous, but which will be packaged to appear to the recipient as if it were the real drugs.

7

22.   Further, if the SUBJECT PACKAGE is transferred to any vehicle or other property located within this Court's jurisdiction, this order authorizes law enforcement to secure the location until an application for a new warrant can be obtained.

## BACKGROUND ON DRUG TRAFFICKERS

23.   Based on my training and experience, I know that the following are common practices of drug traffickers, and that evidence of these common practices is likely to be found at any premises and/or electronic devices (such as cell phones) used by drug traffickers:

i.   It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers, and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

ii.   It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

iii.   That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

iv.   It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

v.   It is common that persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to

the acquisition and concealment of large sums of money resulting from drug trafficking activities.

vi. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

vii. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, U.S. mail, and rental/private automobiles.

viii. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

ix. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

x. Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing

9

business or to use those drugs personally;

xi.    Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

xii.    Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat-sealed bags, Ziploc and/or sandwich baggies, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

xiii.    Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

10

xiv.     Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

xv.     Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed

11

concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

xvi.     Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

xvii.     Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not

encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

xviii.  Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

xix.  Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated  with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

13

xx.     Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xxi.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xxii.   During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence's occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xxiii.  Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles; and

xxiv.   I know that drug dealers often use their vehicles to transport contraband – including

14

drugs, drug proceeds and firearms – and other evidence of their activities. I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following. This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

## CONCLUSION

24.     Based upon the facts set forth in this Affidavit, there is probable cause to believe that, if the SUBJECT PACKAGE is delivered and taken into the residence at the PREMISES, the items described in Attachment B exist and can be found at the PREMISES.

## REQUEST FOR SEALING

25.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure

//

//

//

15

of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

*Sean C. Humphrey*

Sean C. Humphrey
Task Force Officer
United States Postal Inspection Service

Subscribed and sworn to before me on October 30th, 2023.

Peter B. Silvain, Jr.
United States Magistrate Judge

16

## ATTACHMENT A

*Property to be searched*

The property and curtilage to be searched, pictured below, is 300 Calumet Lane, Dayton, OH 45417, further described as a single-story residence with red brick and light tan or off-white siding. The number "300" is in black to right of the window.



## ATTACHMENT B

*Property to be seized*

1.  All records relating to violations of 21 U.S.C. §§ 846, 843, and 841(a)(1), those violations

    involving unknown suspects and occurring after May 25, 2023, including:

    a.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, telephone numbers and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances, including information reflecting transactions for the purchase/sale of narcotics.

    b.  Papers, tickets, notices, credit card receipts, wire transfer receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail, calendars and other correspondence.

    c.  Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

    d.  Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

    e.  Electronic equipment such as pagers, computers, Computer systems, cell phones, PDA devices including hardware, software, data contained in the main unit, printers, external modems, monitors, fax machines and/or other external attachments, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

        i.  This warrant only grants legal authority for law enforcement to *seize* the above-described electronic equipment likely to contain evidence of violations of 21 U.S.C. §§ 846, 843, and 841(a)(1), and to secure said items. A separate warrant will be sought to conduct a *search* of any above-described electronic equipment.

f.     United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

g.     Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

h.     Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

i.     Contraband, such as controlled substances and other materials, paraphernalia and/or equipment and tools used in the drug trade.

j.     Firearms or ammunition.

## ATTACHMENT C

Upon delivery of the SUBJECT PACKAGE (as described in the Affidavit submitted with the warrant application) and the SUBJECT PACKAGE being taken into the residence at the PREMISES, the search warrant will be executed at the PREMISES. The search warrant will be executed at the PREMISES if, and only if, the SUBJECT PACKAGE is taken into the residence located at the PREMISES.

Furthermore, if the SUBJECT PACKAGE is transferred to any vehicle or other property located within this Court's jurisdiction, this warrant authorizes law enforcement to secure the location until an application for a new warrant can be obtained.